J-A07037-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF WALTER WESEMAN A/K/A WALTER WESEMAN, SR. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: BALA LAW GROUP, LLC, EXECUTRIX GRISSEL WESEMAN, AND THE ESTATE OF WALTER WESEMAN | : : : : | No. 961 MDA 2025 |

Appeal from the Order Entered June 23, 2025
In the Court of Common Pleas of Susquehanna County Orphans' Court
at No(s): OC077-2019

BEFORE:  BOWES, J., DUBOW, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.:                    **FILED JULY 23, 2026**

Bala Law Group, LLC ("BLG"), Executrix Grissel Weseman ("Grissel" or "Executrix"), and the Estate of Walter Weseman ("the Estate") (collectively "Appellants") appeal from the June 23, 2025 order confirming the first and final accounting of the Estate.  After careful review, we affirm.

## Background

The orphans' court summarized the relevant facts and procedural background of this matter as follows:

> Decedent Walter Weseman ("Decedent") died October 11, 2011, a resident of Susquehanna County.  At the time of his death, Decedent had four children: Ingrid H. Weseman Gonzalez ("Ingrid"), Walter A. Weseman ("Walter"), Ilka M. Weseman Licairac ("Ilka"), and Grissel….  Decedent's Last Will and Testament was probated on December 1, 2011, and pursuant to its terms, Grissel was appointed as the executrix.  At the inception of the Estate, Grissel hired the law firm of Levene, Gouldin and Thompson ("LGT"), which has offices in both Montrose, Pennsylvania, and Binghamton, New York.  Grissel filed an

ancillary probate proceeding in Broome County, New York, and Letters Testamentary were granted to her in March 2012.

Decedent's death was unexpected. At the time of his death, his son, Walter, was residing in a home owned by Decedent in Vestal, New York. Decedent also owned a home in … Bronx, New York, as well as real property and a home in Brackney, Susquehanna County, Pennsylvania.[1] Decedent's will devised the Brackney property to his four children, left the Bronx property to his three daughters, and left his vehicles, machinery, tools, and personal property to Walter, and the rest, residue, and … remainder of his estate to all of his children. At the time … the will was drafted, under the terms of the will, the Vestal property became part of the Estate residuary.

The Vestal property had a mortgage associated with it. Walter initially did not pay the mortgage, and Grissel paid for the mortgage for approximately 6 months out of her own pocket. Eventually, Walter began to pay the mortgage and made regular payments until he stopped in 2019.

In July 2012, Grissel filed the Pennsylvania Inheritance Tax Return and valued the Brackney real property at $800,000; … said valuation was largely premised upon the value of the natural gas lease and exploration. Thereafter, following a Department of Revenue ruling regarding the valuation of real property with active natural gas leases,[2] Grissel filed an amended return that

---

[1] According to Appellants, the Brackney property consists of 103 acres subject to an oil and gas lease signed by Decedent in 2009. Appellants' Brief at 8 (citation omitted).

[2] On July 10, 2012, the Pennsylvania Department of Revenue issued Inheritance Tax Bulletin 2012-01, which provides, in pertinent part:

The taxable value of natural gas rights shall be determined using the same methodology used to value any real property or tangible personal property interest. Taxable value is most clearly established by determining the actual monetary worth of the interest determined by a *bona fide* sale. If there is no *bona fide* sale, natural gas rights can be determined from an appraisal or other credible evidence. A computed value using assessed value cannot be accomplished because natural gas rights do not have

*(Footnote Continued Next Page)*

provided a value of the Brackney property as being $166,380.[3] In the initial inheritance tax return, Grissel claimed an executrix's commission of [approximately] $53,900.[4] In the amended return, the commission was reduced to $8,376.[5]

Decedent's real and personal property was specifically devised except for the Vestal property, which became the sole asset within the residuary. Given … Walter was residing in that property, and the parties initially agreed to allow Walter and his family to remain in the Vestal property, Grissel opted to sell the Bronx property. Grissel worked to get the Bronx property ready for sale, which required between eight and ten garbage trucks to remove debris

---

assessed values. Therefore, absent a *bona fide* sale, an appraisal[,] or other credible evidence to the contrary, value shall be determined as follows: … For leased, non-producing properties, interests shall be reported at a value of zero unless, at the time of death, the properties were part of a contractual arrangement whereby the properties generated fixed future payments….

Pa. Dep't of Revenue, *Inheritance Tax Bulletin 2012-01*, at ¶ 2 (July 10, 2012), https://www.pa.gov/content/dam/copapwppagov/en/revenue/documents/taxlawpoliciesbulletinsnotices/taxbulletins/inh/documents/inh_bulletin_2012-01.pdf (last modified July 13, 2012) (emphasis omitted; formatting altered).

[3] The amended value of $166,380 represents the assessed value of the Brackney property (for local real estate tax purposes) plus $0 for the non-producing natural gas lease, in accordance with Inheritance Tax Bulletin 2012-01. Appellants' Brief at 13 n.8, 14.

[4] Appellants clarify, in the 2012 Pennsylvania Inheritance Tax Return, Grissel deducted $40,057 for her anticipated commission, calculated based on the reported $800,000 valuation of the Brackney property. Appellants' Brief at 33-34. Grissel separately deducted $13,900 on the New York Inheritance Tax Return "for an additional anticipated [e]xecutrix commission calculated under New York [l]aw with respect to the Vestal [property] and the [Bronx p]roperty." *Id.* at 34. "Thus, the total initial deduction claimed for [Grissel's] commission … was $53,957…." *Id.*

[5] Appellants note the reduced commission of $8,376 represents the anticipated executrix commission based on the amended value of the Brackney property only; it does not include the $13,900 anticipated commission based on the two New York properties. Appellants' Brief at 34-35.

and trash from the residence. Grissel also oversaw repairs to the pipes and drywall [and] … had the property painted. The Bronx property was sold in 2012; … Decedent's Estate then had $349,000 in cash that was placed into the Estate account at that time. Grissel describes this sale as an abatement of the Bronx property, and it provided Grissel with the ability to pay the state inheritance taxes as well as reimburse herself for some of the expenses … she incurred from her own personal funds to pay outstanding Estate bills and liabilities.

In early 2013, Ilka began to press Grissel on finalizing Decedent's Estate. Grissel responded to Ilka with a handwritten note that indicated … she needed a reason to finalize Decedent's Estate, but that such a reason did not exist based upon Ilka's refusal to allow their children to have contact with each other. In August 2013, Grissel's sisters provided notice, by written correspondence, that they wanted both the Vestal and Brackney real propert[ies] listed for sale. As noted by this continued estate litigation, Grissel did not take any meaningful steps to finalizing Decedent's Estate in August 2013[,] despite the request from her sisters to do so.

On July 17, 2017, Walter mailed a letter to LGT requesting a detailed accounting for Decedent's Estate. In response, LGT responded by noting it was sending Walter's request to Grissel in order that she could respond. On August 24, 2017, Walter sent a second letter to LGT requesting "a complete and total detailed accounting" for Decedent's Estate. Walter likewise sent his second request for an accounting directly to Grissel. Grissel never filed an accounting in response to Walter's demands.

Grissel failed to file any federal or state income tax returns for Decedent's Estate from approximately 2015 through 2019. As a result of these failures, when the returns were finally filed, Decedent's Estate incurred penalties and interest in the amount of $72,500.

LGT continued to represent the Decedent's Estate until December 2019, when a petition to withdraw as counsel was filed. The petition noted … Grissel had actively worked with … LGT from December 2011 through mid-2014 to assure … all tax returns had been filed, but thereafter Grissel stopped cooperating. Despite attempts to contact her, Grissel was not responding to her attorney's calls, emails, and letters. In April 2019, Grissel had contacted LGT because her brother had stopped making the mortgage payments on the Vestal property. LGT assigned an

attorney to work with Grissel, but she was not satisfied. LGT noted … there had been a breakdown in communication and … Grissel was not providing the necessary information to finalize the Estate. In October 2019, LGT mailed the entire file to Grissel, together with a consent to change attorney form, but Grissel never responded. As a result, LGT filed its motion to withdraw as counsel. This court entered a rule returnable date for January 21, 2020. Grissel never answer [*sic*] the petition for leave to withdraw. As a result, LGT was granted leave to withdraw as counsel. In February 2020, Grissel hired [BLG] to represent Decedent's Estate.

After Walter stopped paying the mortgage on the Vestal property and LGT had withdrawn from representation, Grissel worked with [BLG] in connection with resolving the issues surrounding Walter's refusal to leave the Vestal property or, in the alternative, to purchase it from Decedent's Estate. In June 2021, [BLG] was able to negotiate a resolution with Walter, which provided: (1) Walter would purchase the Vestal property for $325,000; (2) Walter waived any interest in the residuary of Decedent's Estate, which would be made up of the purchase money from the sale of the Vestal property; (3) Walter would give up a … 1/8 interest in the Brackney property in favor of his sisters; (4) Walter gave up a … 1/8 interest in the natural gas royalties accruing from the Brackney property commencing on January 1, 2021; (5) Walter waived any right or interest in past natural gas royalties received by Decedent's Estate; and (6) Walter agreed to release an additional $30,000 in future royalties attributed to his … 1/8 interest to be retained by Decedent's Estate. Walter subsequently purchased the Vestal property pursuant to the settlement agreement with Decedent's Estate.

Despite resolving the Vestal property in June 2021, Grissel failed to move forward with a final accounting and proposed distribution of Decedent's Estate. On November 15, 2022, Ilka filed a motion to compel an accounting, to remove Grissel as the executrix, and to impose a surcharge against her. Pursuant to a subsequent motion from Ilka, the court bifurcated the surcharge issue and scheduled a hearing for February 7, 2023, on Ilka's motion to compel an accounting and motion to remove Grissel as [the] executrix. After the hearing on February 7, 2023, the court denied the motion to remove Grissel as the executrix and granted the motion to compel an accounting. Grissel was ordered to file an accounting within 120 days.

On June 5, 2023, Grissel filed a first and final accounting, together with a petition for adjudication. On June 21, 2023, Ilka filed [the following] objections to the accounting: (1) a request for a surcharge against Grissel based upon the interest and penalties incurred in connection with her failure to file timely income tax returns; (2) a surcharge against Grissel based upon her failure to disperse income received in natural gas revenue so as to permit it to be taxed at a higher income tax rate than would have occurred if those funds had been distributed to the heirs; (3) excessive legal fees charge[d] by [BLG]; (4) improper distributions made by Grissel to herself; (5) excessive commission sought by Grissel for her work as Executrix; (6) improper attempt to reserve funds for a partition action; (7) improper allocation of attorneys' fees in an attempt to charge Ilka with interest on an early disbursement; and (9) the failure to preserve Estate assets in connection with the Vestal property. On June 22, 2023, Ingrid filed her own objection adopting the objections made by Ilka.[6] On October 5, 2023, Grissel filed a written response to the objections. A hearing on the objections was conducted on December 15, 2023, and [continued on] March 26, 202[4, at which time the orphans' court granted the parties an opportunity to brief their respective positions].

Ilka presented the testimony of an expert witness, Michael Briechle, Esquire ("Briechle"), as to the propriety of the legal fees charged by [BLG].[7] In particular, Briechle opined … a reasonable fee in the Susquehanna County area when [BLG] began its representation of the Estate would have been between $275 to $290 per hour, and as of the date of the hearing, between $300 to $325 per hour. Briechle also opined … a paralegal rate during that period of time would have been between $150 to $200 per hour. … Briechle also identified $15,993.50 in legal fees that were improperly billed at an attorney rate when they should have been performed by paralegals or other office personnel. Finally, the

---

[6] Ilka and Ingrid are sometimes referred to collectively herein as "Objectors."

[7] The orphans' court accepted Briechle as "an expert in the field of estate administration law in Pennsylvania." N.T., 12/15/23, at 83; *see also id.* at 77 (Briechle's testifying he has handled "hundreds" of estate administration cases in Pennsylvania since 2013, with about 85% of those cases being in Susquehanna County).

record established … Ilka's counsel was charging the fee of $340 per hour for the work on the Estate file.

Estate counsel, Rebecca Rosenberger Smolen, Esquire ("Smolen"), testified to her past experiences in estate practice [in the Philadelphia area] and noted … she was a founder of [BLG], which practices solely in the area of estate law. Smolen testified to the efforts made by [BLG] to get the Estate litigation resolved after it was retained in February 2020. Smolen also disputed the claims related to the challenges made by Briechle related to her performance of administrative tasks that were billed out at an attorney rate. Finally, Smolen defended her hourly rate as a rate that was less than the customary rate in the Philadelphia area and contended … the reasonableness of her fee should not be subjected to the geographic norms where the Estate is pending.

Orphans' Court Opinion ("OCO I"), 5/23/24, at 1-7 (cleaned up).

On May 23, 2024, upon consideration of the objections to the first and final accounting and petition for proposed distribution, the reply thereto, oral argument, and subsequent briefs submitted by the parties, the orphans' court entered an order declaring:

1. Objectors' request for a surcharge against Grissel…, Executrix of the Estate…, for the failure to file timely estate income tax returns is **GRANTED**. Grissel … shall pay a surcharge to the Estate in the amount of … $72,500…, together with interest at the rate of … 6%[] from July 2020 totaling … $16,312.50[].

2. Objectors' request for a surcharge against Grissel…, Executrix of the Estate…, for failing to make early disbursement of natural ga[s] royalties, is **DENIED**.

3. Objectors' objection based upon a claim of excessive attorney[s'] fees is **SUSTAINED**. [BLG] shall adjust their billing to provide for an hourly rate of … $350 … per hour. [BLG] shall also adjust its billing for 6.1 hours identified in Exhibit A of Exhibit 15 to reflect an hourly rate of $200 per hour.

4. Objectors' objection to alleged improper distributions made by Grissel … to herself is **OVERRULED**.

5.  Objectors' objection to the commission for the executrix is **SUSTAINED**. The commission for the work performed by Grissel … as Executrix of the Estate … shall be reduced to … $33,850….

6.  Objectors' objection to the creation of a reserve to partition the Brackney real property is **SUSTAINED**.

7.  Objectors' objection to an attempt to surcharge [O]bjectors for costs of attorney[s'] fees necessary to response [*sic*] to the objections is **SUSTAINED**.

8.  Objectors' request for a surcharge against Grissel…, Executrix of the Estate…, for attorney[s'] fees incurred by the [E]state in opposing the successful objections, is **GRANTED**. Grissel … shall be responsible for any attorney[s'] fees incurred in connection with the defense of any objections sustained[,] as well as responsible for any attorney[s'] fees incurred in connection with any unsuccessful attempt to avoid an imposed surcharge.

9.  Objectors' request to be reimbursed attorney[s'] fees and expert costs incurred in litigating their successfully [*sic*] objections and request for surcharges is **GRANTED**. The Estate … shall reimburse [O]bjectors for any attorney[s'] fees and expert fees paid out for any objections sustained or surcharges imposed.

10. Objectors' objection to the request to charge Ilka … interest for early distribution is **SUSTAINED**.

11. Objectors request for a surcharge against Grissel…, Executrix of the Estate…, for failing to preserve the Vestal property[] is **DENIED**.

12. The request for sanctions made by Grissel…, Executrix of the Estate…, against [O]bjectors for initiating and maintaining the litigation against the [E]state is **DENIED**.

13. Grissel…, Executrix of the Estate…, shall file an amended first and final accounting and petition for proposed distribution within sixty (60) days of today's date to reflect the adjustments now necessary under this order and the attached opinion.

Order, 5/23/24, at 1-3 (emphasis in original).[8] Additionally, the orphans' court stated, "When the amended accounting is submitted, [E]state counsel will be directed to remove any charges related to the litigation surrounding the reasonableness of counsel's fees." OCO I at 15 n.7; **see also id.** (noting approximately 50% of the hearing on the objections was devoted to the challenge to BLG's attorneys' fees).

On August 22, 2024, Ilka filed a motion for contempt against Grissel, due to her failure to file an amended first and final accounting and petition for proposed distribution in compliance with the May 23, 2024 order, which the orphans' court ultimately denied on October 15, 2024. By separate order of court dated October 15, 2024, the orphans' court directed Grissel to "file an amended first and final accounting and petition for proposed distribution within sixty days of today's date to reflect the adjustments necessary under the May 2[3], 2024 opinion and order." Order, 10/15/24, at ¶ 3. Grissel

_____

[8] Appellants filed a timely appeal from the May 23, 2024 order disposing of the objections to the first and final accounting and petition for proposed distribution at No. 897 MDA 2024. However, on August 13, 2024, this Court issued a *per curiam* order quashing the appeal as premature. **See McCutcheon v. Philadelphia Elec. Co.**, 788 A.2d 345, 349 (Pa. 2002) ("[A]n appeal lies only from a final order, unless otherwise permitted by rule or by statute."); **see also** Pa.R.A.P. 341(b)(1) ("A final order … disposes of all claims and of all parties[.]"); Pa.R.A.P. 342(a)(1) (providing an order confirming an account is an appealable orphans' court order as of right); **In re Estate of Cherwinski**, 856 A.2d 165, 166-67 (Pa. Super. 2004) ("In a decedent's estate, generally the confirmation of the final account of the personal representative represents the final order…."); *Per Curiam* Order, 8/13/24, at 1 (noting "the order does not confirm the final account of [D]ecedent's personal representative and is, therefore, neither the final order nor an orphans' court order appealable as of right under Rule 342").

complied, filing a "Cash Bringdown Statement Through December 6, 2024 (in lieu of full Amended Account)" and "Revised Statement of Proposed Distribution" on December 13, 2024.

On December 31, 2024, Ilka filed objections to the amended accounting, which included the following:

> (1) an objection to Grissel's request for $30,000 in interest accruals that did not appear in the first and final accounting;[9] (2) an objection to Grissel's request for reimbursement for $16,000 in mortgage and tax payments made on the Vestal property; (3) an objection to the improper allocation of Ilka's attorney[s'] fees and expert fees as the fees relate to successful and unsuccessful objections; (4) an objection to the improper allocation of attorney[s'] fees incurred by the Estate in unsuccessfully defending the objections; (5) an objection to the Estate['s] paying legal fees connected with filing an amended accounting; and (6) an objection to the continued reserve of monies by the Estate.

Orphans' Court Opinion ("OCO II"), 3/12/25, at 8. Grissel filed a reply to the objections, and a hearing was held on March 3, 2025.

On March 12, 2025, the orphans' court entered an order sustaining in part and overruling in part Ilka's objection to the reimbursement sought by Grissel, stating "Grissel … shall be entitled to a reimbursement in the amount of $10,951.20 for monies advanced to pay delinquent mortgage payments on the Vestal property, but Grissel … shall not be entitled to any reimbursement for the alleged payment of a tax lien." Order, 3/12/25, at ¶ 1. Additionally,

---

[9] Specifically, Ilka averred "Grissel seeks 10 years of interest claimed on Commission at 6% totaling $20,310 … and 10 years of interest claimed on Mortgage & Tax Lien Advanced at 6% totaling $9,600…." Objections to Amended Accounting, 12/31/24, at ¶ 5 (internal quotation marks and footnote omitted).

- 10 -

the orphans' court sustained Ilka's objections regarding the allocation of attorneys' fees, declaring:

> The Estate shall reimburse [Ilka] in the amount of $24,615 for attorney[s'] fees, paralegal fees[,] and expert fees incurred in the successful litigation of the initial set of objections. … Grissel … is assessed a surcharge in the amount of $12,827.50 to be paid to the Estate as reimbursement for attorney[s'] fees expended in the unsuccessful defense of [O]bjector[s'] initial set of objections.

*Id.* at ¶¶ 3-4 (formatting altered). The remainder of Ilka's objections were overruled. *Id.* at ¶¶ 2, 5-6. The orphans' court further directed Grissel to "file a second amended first and final accounting and petition for proposed distribution within thirty (30) days … to reflect the adjustments now necessary under this order and the attached opinion." *Id.* at ¶ 7.

Ilka timely filed a Motion for Reconsideration, asserting the orphans' court's March 12, 2025 order failed to address her objection regarding the improper inclusion of interest on the executrix's commission in the amount of $20,310. Motion for Reconsideration, 3/14/25, at ¶¶ 3-6. Upon consideration of the motion and the arguments made at the March 3, 2025 hearing, the orphans' court sustained Ilka's objection as to the inclusion of interest on the executrix's commission by order of court dated March 31, 2025. Order, 3/31/25, at ¶ 1; *see also id.* at ¶ 2 (directing the executrix to "file a second amended first and final accounting and petition for proposed distribution within 30 days to reflect the adjustments necessary pursuant to the rulings on the objections"). Accordingly, Grissel filed a Second Amended Accounting

and Statement of Proposed Distribution on April 30, 2025. No objections were filed.

On June 23, 2025, after the time to file objections passed, the orphans' court confirmed the First and Final Accounting dated June 5, 2023, as modified by the court's orders dated May 23, 2024, and March 12, 2025, and as modified by the Second Amended Statement of Proposed Distributions filed on April 30, 2025. Order, 6/23/25, at 1 (single page).

On July 21, 2025, Appellants filed a timely notice of appeal,[10] followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The orphans' court filed its Rule 1925(a) opinion on August 11, 2025.

## Issues

On appeal, Appellants present the following issues for our review:

1. Whether the [o]rphans' [c]ourt erred as a matter of law by disregarding the correct legal standard and applying the incorrect legal standard for determining reasonable attorney[s'] and paralegal fees in the estate administration context (improperly capping the out-of-county estate attorney's hourly rate to the maximum hourly rate the [o]rphans' [c]ourt [j]udge had previously awarded in a civil

---

[10] Appellants purport to appeal from both the May 23, 2024 and June 23, 2025 orders; however, the appeal properly lies from the June 23, 2025 order confirming the final account. *See McCutcheon*, *supra*; *see also* Pa.R.A.P. 341(b)(1); Pa.R.A.P. 342(a)(1); *Estate of Cherwinski*, *supra*. Upon entry of the June 23, 2025 order, the orphans' court's May 23, 2024 interlocutory order also became subject to appellate review. *See Quinn v. Bupp*, 955 A.2d 1014, 1020 (Pa. Super. 2008) ("[I]nterlocutory orders that are not subject to immediate appeal as of right … become reviewable on appeal upon the trial court's entry of a final order.") (citations and brackets omitted).

- 12 -

litigation sanctions matter and improperly capping the hourly rate for paralegal time based on unidentified paralegals in Susquehanna County)?

2. Whether the [o]rphans' [c]ourt erred in awarding any surcharge without requiring Object[ors] to first satisfy [their] legal burden of proving the elements of a surcharge claim?

3. Whether, in any event, the surcharge awards were an abuse of discretion given that (a) all positions taken in the Petition for Adjudication were reasonable and presented in good faith and (b) [E]xecutrix always agreed to pay the full loss upon which the surcharge awards were based (which was less than the amount she was due from the [E]state)?

4. Whether the [o]rphans' [c]ourt abused its discretion by, *inter alia*: (a) declining to consider facts demonstrating the complex, lengthy[,] and extraordinary nature of this [E]state, including [E]xecutrix's siblings' "unclean hands[";] (b) admitting and relying upon improper hearsay evidence based on the judicial admission exception (which was inapplicable); (c) relying on an emotional letter [E]xecutrix wrote to her sister in 2013, taken out of context, while ignoring the facts at the relevant time and capriciously disregarding all the evidence [E]xecutrix presented; (d) finding [E]xecutrix breached her fiduciary duties for making a reasonable compensation proposal in her Petition for Adjudication; and (e) considering only the taxable value of principal assets (instead of considering the entirety of the [E]state's assets) when calculating the executrix commission?

5. Whether the [o]rphans' [c]ourt erred by ordering [BLG] to remove from the Formal Accounting its fees incurred in defending its reasonable fees and in shifting to the executrix [BLG's] fees incurred in defending any sustained [o]bjection (when her positions were all reasonable and taken in good faith)?

6. Whether the [o]rphans' [c]ourt erred by shifting to the [E]state Object[ors'] attorney[s'] and expert fees that Object[ors] incurred in pursuing any imposed surcharge or sustained Objection?

Appellants' Brief at 4-6.[11]

## Discussion

To begin, we note our standard of review of the findings of an orphans'

court is deferential. *See In re Estate of Harper*, 975 A.2d 1155, 1159 (Pa.

Super. 2009).

> When reviewing a decree entered by the orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the orphans' court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.
>
> However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Id*. (internal citations, quotation marks, and unnecessary capitalization

omitted).

I.      *Reasonableness of Attorneys' Fees*

In their first issue, Appellants challenge the orphans' court's decision

sustaining Ilka and Ingrid's objection to the first and final accounting on the

---

[11] While Appellants identify six issues for our review in their statement of questions presented, the argument section of their brief is divided into ten sections, some of which contain multiple subsections. *See* Appellants' Brief at 83-153. The Pennsylvania Rules of Appellate Procedure require the argument section of an appellate brief to be divided into as many parts as there are questions to be argued. Pa.R.A.P. 2119(a). Failure to do so may result in waiver. *Ramalingam v. Keller Williams Realty Grp., Inc.*, 121 A.3d 1034, 1042 (Pa. Super. 2015). While we do not condone Appellants' failure to comply with the Rules of Appellate Procedure, the defect in Appellants' brief does not impede our ability to render meaningful appellate review; therefore, we decline to find waiver on this basis. *See id.*

grounds of excessive legal fees and thereby reducing the attorneys' and paralegal fees charged by BLG. We review this claim mindful of the following legal principles and guidelines.

"[A]ttorney[s'] fees in an estate are based on the reasonable value of the service actually rendered." **In re Estate of Rees**, 625 A.2d 1203, 1206 (Pa. Super. 1993) (citation omitted). "Attorneys and executors seeking compensation from an estate have the burden of establishing facts which show the reasonableness of their fees and entitlement to the compensation claimed." **Id.** (citation omitted). The orphans' court is authorized "to reduce to a 'reasonable and just' level those fees and commissions claimed by the fiduciary and their counsel." **Id.** (citation omitted).

Our Supreme Court set forth the following guidelines for assessing the reasonableness of attorneys' fees:

> What is a fair and reasonable fee is sometimes a delicate, and at times a difficult question. The facts and factors to be taken into consideration in determining the fee or compensation payable to an attorney include: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

**In re LaRocca's Trust Estate**, 246 A.2d 337, 339 (Pa. 1968). "By now it is hornbook law that the reasonableness of the fee is a matter for the sound

discretion of the lower [c]ourt and will be changed by an appellate [c]ourt only when there is a clear abuse of discretion." *Id.* The Court has long held:

> The amount of fees to be allowed to counsel, always a subject of delicacy if not difficulty, is one peculiarly within the discretion of the court of first instance. Its opportunities of judging the exact amount of labor, skill and responsibility involved, as well as its knowledge of the rate of professional compensation usual at the time and place, are necessarily greater than ours, and its judgment should not be interfered with except for plain error.

*Id.* at 340 (quoting *In re Good's Estate*, 24 A. 623, 623 (Pa. 1892)).

> Further, this Court has explained:

> We have a limited power of review of court[-]awarded fees. As [our] Supreme Court has so frequently stated, the responsibility for setting such fees lies primarily with the trial court[,] and we have the power to reverse its exercise of discretion only where there is plain error. Plain error is found where the award is based either on factual findings for which there is no evidentiary support or on legal factors other than those that are relevant to such an award. The rationale behind this limited scope of review is sound. **It is the trial court that has the best opportunity to judge the attorney's skills, the effort that was required and actually put forth in the matter at hand, and the value of that effort at the time and place involved.**

*Carmen Enters., Inc. v. Murpenter, LLC*, 185 A.3d 380, 390 (Pa. Super. 2018) (emphasis in original; citation omitted); *see also id.* (noting the trial court is not required to address every *LaRocca* factor); *id.* ("Consideration of any one or a combination of the *LaRocca* factors may convince the court that a different fee is justified.") (emphasis and citation omitted). "Additionally, it has long been the law of Pennsylvania that attorneys' fees should be on a moderate scale of compensation, and none should be allowed but such as are

fair and just." *Id.* (quoting *In re Huffman's Estate*, 36 A.2d 640, 643 (Pa. 1944)) (cleaned up).

Instantly, Appellants claim the orphans' court erred because it held *LaRocca* does not apply to Susquehanna County estates; rather, they aver the court determined "local attorney rates … are the **only** consideration in evaluating an estate attorney's reasonable fee." Appellants' Brief at 82-83 (emphasis in original). They contend, "[e]ven though Attorney Smolen put on evidence of every single relevant factor pursuant to the correct legal standard, the [o]rphans' [c]ourt held such evidence **irrelevant**," *id.* at 82 (emphasis in original), and instead "applied its own arbitrary formula that is not consistent with Pennsylvania precedent," *id.* at 84. In doing so, Appellants claim the orphans' court essentially created "a price ceiling for legal services in Susquehanna County[,] which stifles competition and disadvantages clients who seek expertise which may not be readily available in the county." *Id.* at 85.

Appellants further argue, even if the orphans' court applied the correct legal standard, "[it] abused its discretion by failing to find this [Estate] a complex estate with extraordinary circumstances." *Id.* at 110 (cleaned up); *see also id.* at 112 (baldly averring Appellants "presented uncontroverted evidence of unusual complications in this Estate"). They assert that rather than conducting its own analysis regarding the complexity of the Estate, the orphans' court summarily adopted the conclusory opinion of the Objectors'

purported expert, which is lacking in evidentiary support. ***Id.***;[12] ***see also id.*** at 112 (noting Briechle testified "a 'normal' estate administration in Susquehanna County should have cost less"). Additionally, Appellants contend Briechle failed to review the formal accounting, petition for adjudication, and Grissel's reply to the objections to the first and final accounting and, thus, his opinion is based on only a partial reading of the record. ***Id.*** at 112. Based on their assertion that Briechle "is not familiar with the complex nature of this specific estate[,]" Appellants conclude the orphans' court should not have relied on his opinion. ***Id.*** No relief is due on this claim.

First, much of Appellants' argument is premised on their misrepresentation of the orphans' court's holding. Contrary to Appellants' assertion, the orphans' court did **not** find ***LaRocca*** is inapplicable in Susquehanna County estates,[13] nor did it hold local attorney rates are the

---

[12] Briechle opined this Estate is not unusually complex. ***See*** N.T. at 88, 92.

[13] We acknowledge the orphans' court's suggestion that "the ***LaRocca*** factors are **more appropriately applied** in situations where the attorney['s] fee is based upon a percentage as opposed to a detailed accounting as to the work performed." OCO I at 14 n.4 (emphasis added). However, as explained *infra*, the orphans' court did not find the ***LaRocca*** factors to be **irrelevant** to the case *sub judice*. Moreover, we clarify Pennsylvania courts have consistently applied the ***LaRocca*** factors to determine the reasonableness of attorneys' fees regardless of the method of calculation of those fees, although the analysis itself may vary depending on the relevancy of the individual factors to each particular case. ***Compare, e.g.***, ***Carmen Enters., Inc.***, 185 A.3d at 389-90, 392-95 (affirming the trial court's reduction of the attorney's hourly rate and number of hours billed in light of the ***LaRocca*** factors; concluding the trial court properly applied the ***LaRocca*** test, but noting most of the ***LaRocca*** factors do not specifically apply in this case); ***with Gilmore by***
*(Footnote Continued Next Page)*

**only** consideration in evaluating the reasonableness of an estate attorney's fees. **See id.** at 82-83. Rather, as the orphans' court explained:

> Ilka and Ingrid object[ed] to the attorney[s'] fees charged by [BLG] as they related to the hourly rate charged being not reasonable to Susquehanna County estate practice. In reviewing the billing statements, [BLG] was charging between $355 to $425 per hour for attorney work and between $220 and $250 per hour for paralegal work. Occasionally, the billing report would indicate a "blended" charge of $320 per hour, which appears to be a situation where the work was somehow a mix between attorney work and paralegal work.

OCO I at 10.

In its opinion accompanying its May 23, 2024 decision, the orphans' court properly noted that while it is the burden of the attorney whose fees have been challenged to prove the reasonableness of his or her requested compensation, the decision relating to the appropriateness of said fees is left to the sound discretion of the trial court. **See id.** (citations omitted). Further, it acknowledged the guidance set forth by our Supreme Court in **LaRocca** for determining the reasonableness of attorneys' fees. **See id.** at 11 (listing the **LaRocca** factors). The orphans' court emphasized, however, that in the case *sub judice*, Ilka and Ingrid did **not** take issue with the amount or quality of work performed by BLG. **Id.** Rather, they objected to "the use of an hourly rate utilized in a large urban area for work performed in a small rural county where such attorney[s'] fees are substantially reduced." **Id.**; **see also id.**

---

**Gilmore v. Dondero**, 582 A.2d 1106, 1109-10 (Pa. Super. 1990) (affirming the trial court's reduction of counsel's percentage-based contingency fee where the trial court conducted a thorough analysis of the **LaRocca** factors, applying each of the listed factors to this case).

(noting "[t]he only disinterested expert testimony provided in this proceeding concluded … these rates were far more than the customary rates charged in Susquehanna County for estate practice").

Accordingly, the orphans' court examined prior cases in the area and opined:

> The orphans' court of Susquehanna County has previously determined in contested fee cases that a reasonable hourly rate of pay for an attorney performing general estate work in Susquehanna County was $250 per hour and $50 per hour for paralegal or administrative work.[1] **See In re Estate of Beam**, No. 2016-66 O.C., Slip Op., at 6 (Susq. Cty. Ct. Com. Pl. Sept. 7, 2016); **see also Cabot Oil & Gas Corp. v. Speer**, [No.] 2017-936 C.P., Slip Op., at 2 n.1 ([Susq. Cty. Ct. Com. Pl.] Sept. 28, 2000) (finding prevailing hourly rate of pay for an experienced litigator in Susquehanna County would be $250 per hour and an experienced complex litigator to be $350 per hour).[2] When [BLG] was retained in February 2020, this court ha[d] previously determined … the customary rate for an experienced litigator and/or an estate attorney in Susquehanna County was $250 per hour.[3]
>
> [1] In Susquehanna County, court[-]appointed counsel in criminal matters and juvenile dependency matters are paid at the rate of $70 per hour. An attorney appointed to serve as a hearing officer in divorce litigation or a guardian *ad litem* in custody litigation are paid at the rate of $100 per hour. These court-appointed rates provide a further backdrop as to the economic state of Susquehanna County as it relates to the payment of attorneys' fees.
>
> [2] **Cabot** involved a sanction award of attorneys' fees in connection with discovery violations. In that case, this court reduced the experienced complex litigator's hourly rate from $540 per hour to $350 per hour, and the experienced litigator's rate from $380 per hour to $250 per hour. While this case was not an orphans' court matter, the litigation involved in that proceeding was far more complex and contentious than the litigation presented in this estate matter.

[3] The United States District Court for the Middle District of Pennsylvania has likewise approved similar attorneys' fees by noting[,] … "we find … these hourly rates of $200 and $325 are entirely commensurate with reasonable prevailing hourly rates recently determined by this court in other fees litigation." *And[re]sen v. Pennsylvania*, 2022 WL 808493, at *8 (M.D. Pa. 2022) (collecting cases), *rev'd on other grounds*, 2022 WL 3334495 (M.D. Pa. 2022); *see also Souryavong v. Lackawanna County*, 872 F.3d 122 (3d Cir. 2017) (affirming finding that $250 per hour was the prevailing rate for an attorney litigator practicing in Lackawanna County).

*Id.* at 11-12 (cleaned up).

The orphans' court rejected Appellants' contention that it is not permitted to determine the reasonableness of attorneys' fees in an estate matter "based upon whether the attorney[s'] fee [are] reasonable within the general geographic area where the trial court is located." Orphans' Court Opinion ("OCO III"), 8/11/25, at 1. In support, it opined:

For more than four decades, the Superior Court has recognized … the reasonableness of an attorney fee in estate litigation is directly connected to "what the prevailing rate in the general area was at the time [… the legal services were rendered to the estate]." *In re Estate of Brockerman*, 480 A.2d 1199, 1204 (Pa. Super. 1984). If the reasonableness of an attorney fee is untethered from the geographic location of the court itself, then the court would be bereft of any measuring stick to determine whether a particular attorney fee is reasonable. Indeed, the reasonableness of the fee for any service, professional or otherwise, is necessarily dependent upon the market forces at work in the geographic area where the fee is being charged. Prior to the consideration of any of the factors set forth in … *LaRocca*…, … the trial court must start with its general knowledge of the fees charged for legal services in its jurisdiction, and thereafter assess the reasonableness of the attorney[s'] fees based upon the *LaRocca* factors as applied to the local market prices.

*Id.* at 1-2 (brackets in original). We agree.

- 21 -

While local attorneys' rates are not explicitly listed as one of the *LaRocca* factors to be considered in determining the reasonableness of attorneys' fees, our courts have long recognized the relevancy of such rates in the overall reasonableness analysis. *See, e.g.*, *In re Lebanon Nat. Bank*, 130 A.2d 498, 500-01 (Pa. 1957) (finding no abuse of discretion where the trial court took into consideration its knowledge of the local rate of professional compensation in determining a fair and reasonable fee to compensate an attorney for his representation of the trustee in an *inter vivos* trust litigation); *Good's Estate*, 24 A. at 623 ("The amount of fees to be allowed to counsel … is one peculiarly within the discretion of the court of first instance. Its opportunities of judging the exact amount of labor, skill, and responsibility involved, **as well as its knowledge of the scale of professional compensation usual at the time and place**, are necessarily greater than ours….") (emphasis added); *Estate of Brockerman*, 480 A.2d at 1204 (deeming the record insufficient to support the orphans' court's award of attorneys' fees where it did not appear "what hourly rate the firm charged, **what the prevailing rate in the general area was at the time**, what services were performed, or how much time those services consumed") (emphasis added).

Moreover, we have previously acknowledged, "It is peculiarly within the purview of a trial court to develop [a] sense for what is an appropriate fee in a given locale for a given type of case." *Gilmore by Gilmore*, 582 A.2d at 1110. We explained:

> Indeed, the very ability of a trial court to develop this knowledge is one reason why our standard of review of attorneys' fee awards is so restrictive. As the Supreme Court has stated, we must rely not only on the peculiar opportunity of the trial court to assess the efforts of counsel in the particular case, but also on **its knowledge of "the rate of professional compensation usual at the time and place**…." ***Thompson Estate***, … 232 A.2d 625, 631 ([Pa.] 1967).

***Id.*** (emphasis added).

In ***Gilmore by Gilmore***, we considered whether the trial court abused its discretion in reducing the amount of counsel fees payable out of settlement proceeds from the agreed upon 1/3 contingency fee to a 25% fee. ***See id.*** at 1107. There, "the [trial] court employed its understanding of prevailing contingent fee standards in the relevant location and its experience with like cases" in determining 25% was a presumptively reasonable base figure. ***Id.*** at 1110; ***see also id.*** (stressing the presumption that 25% is a reasonable fee is a rebuttable presumption that can be overcome by showing justification for a higher fee in a particular case). It then employed the ***LaRocca*** factors in assessing whether counsel met his burden to justify the higher requested amount. ***Id.*** We determined "nothing in ***LaRocca*** in any way suggests that a court may not begin its analysis with a base figure as a starting point." ***Id.*** The burden of counsel remains the same — counsel must show the fee requested is reasonable under the test set forth in ***LaRocca***. ***Id.*** Thus, it is apparent the trial court's knowledge of local prevailing rates may serve as contextual information within the broader framework of ***LaRocca***.

Applying the foregoing principles to the instant matter, the orphans' court stated: "Smolen bore the burden of demonstrating that the hourly rates charged were reasonable for Susquehanna County estate practice. But [she] presented no evidence whatsoever as to the reasonableness of her hourly rate when compared to the customary hourly rate charged in Susquehanna County for estate work." OCO I at 14. In fact,

> Smolen conceded … she "does not have the practice of changing her billable rate when she works for a client based in a different jurisdiction." [Appellants' Brief] at 40-41 n.31.[] While this may be Smolen's practice, it fails to recognize that an auditing court in estate litigation has an obligation to review the reasonableness of the hourly rate charged to determine whether that hourly rate is reasonable when compared to the prevailing rate in the local legal community for estate practice.

*Id.* at 14 n.4.

The orphans' court further observed, "Briechle was the only expert witness who testified as to the customary hourly rate in Susquehanna County[,] and this expert testimony was consistent with prior decisions of the Court of Common Pleas of Susquehanna County." *Id.* at 14.[14] Thus, in the

---

[14] *See* N.T. at 93-94 (Briechle's testifying the fair and reasonable hourly rate for an estate administration attorney practicing in Susquehanna County in 2020 was approximately $270 to $290 per hour); *id.* at 94 (Briechle's opining $300 to $325 per hour is the present, reasonable, hourly rate for an estate administration practitioner in Susquehanna County with the necessary level of experience to administer this Estate); Appellants' Exhibit 15 at 7 ¶ 2 (Briechle's reporting paralegal rates in Susquehanna County during 2020 through 2023 were between $150 and $200 per hour); *see also* N.T. at 88 (Briechle's opining the administration of Decedent's Estate "definitely was not" complex); *id.* at 90 (Briechle's explaining the fact this Estate had real estate in different jurisdictions was not in and of itself a complicating factor); *id.* at 92 (Briechle's reiterating this Estate was not unusually complex).

absence of any evidence from Smolen as to the reasonableness of her hourly rate when compared to the customary hourly rate charged in Susquehanna County for estate work, "and given the expert testimony provided by Briechle, coupled with the prior decisions of this court establishing customary hourly rates," the orphans' court concluded Appellants failed to prove the hourly fees charged by BLG in this estate litigation were reasonable for Susquehanna County estate practice. *Id.* at 14 n.4.

Additionally, the orphans' court noted:

> Smolen never presented any fee agreement signed by Ilka and Ingrid[,] nor did she ever submit any billing that would demonstrate … Ilka and Ingrid were aware [of] Smolen's hourly rate. Moreover, when initially retained, Smolen could have certainly disclosed her hourly rate to all the heirs of the Estate and asked that the heirs join in any fee agreement to establish … the heirs agreed … the fee was a reasonable rate. This was not done. There is no evidence submitted whatsoever to demonstrate … Ilka and Ingrid ever consented to the hourly rate of [BLG].

*Id.* at 15 n.6.

Based on the foregoing, the orphans' court sustained Ilka and Ingrid's objection regarding the excessiveness of attorneys' fees incurred by the Estate and directed BLG to adjust their billing to reflect an attorney rate of $350 per hour and a paralegal rate of $200 per hour. *See* Order, 5/23/24, at ¶ 3; OCO I at 14-15.[15] In support of its decision, the orphans' court opined:

---

[15] Regarding the billing entries totaling 6.1 hours, which Briechle identified as administrative tasks and the orphans' court ordered BLG to bill at a reduced hourly rate of $200, *see* Order, 5/23/24, at ¶ 3, Appellants baldly assert the

*(Footnote Continued Next Page)*

- 25 -

This hourly rate is consistent with the prior rate approved for **an experienced attorney engaged in complex litigation**. ***Cabot***, ***supra***. While the litigation in this matter was not unduly complex,[16] Smolen did establish … she had extensive experience in estate practice that would support a higher rate … commiserate with the hourly rate for a complex case litigator. Moreover, the record demonstrated … Ilka's counsel, which operates a firm in

---

orphans' court failed to conduct an independent review of the pertinent time entries and as a result, failed to recognize, *inter alia*, "such charges were not for the underlying administrative tasks described … but rather the supervisory oversight required of an attorney for those tasks, which is properly billed at attorney rates." Appellants' Brief at 108-09. We deem this argument waived for lack of development, as Appellants fail to provide any legal citations or discussion of relevant legal authority in support of their position. ***See Umbelina v. Adams***, 34 A.3d 151, 161 (Pa. Super. 2011) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.") (citations omitted). Notwithstanding waiver, this Court has previously determined it is well within the broad discretion of the trial court to reduce the hourly rate of an attorney's fee for non-specialized administrative tasks the attorney chose to do himself. ***See Carmen Enters., Inc.***, 185 A.3d at 392.

[16] To the extent Appellants argue the orphans' court should not have relied on Briechle's opinion regarding the complexity of Decedent's Estate and that the orphans' court abused its discretion in not finding this matter to be complex, we deem this claim to be wholly without merit. First, based on our review of the record, it is evident the orphans' court considered all the pleadings, briefs, and evidence presented in reaching its conclusion that this was not a complex Estate. Also, we observe that contrary to Appellants' assertion Briechle's opinion was based only on a partial reading of the record, Briechle testified at the December 15, 2023 hearing on the objections to the first and final accounting that he reviewed the accounting, as well as the docket and related filings, in preparation for giving his expert opinion in this matter. ***See*** N.T. at 83-84. As the factfinder, the orphans' court was free to believe all, part, or none of the evidence presented. ***See Commonwealth v. Gibbs***, 981 A.2d 274, 282 (Pa. Super. 2009) (citing ***Commonwealth v. Griscavage***, 517 A.2d 1256 (Pa. 1986)). "On issues of credibility, it is not our role as an appellate court to reweigh the evidence and substitute our judgment for the factfinder, who saw the witnesses firsthand." ***In re Estate of Grigg***, 324 A.3d 40, 45 (Pa. Super. 2024).

> Susquehanna County, was charging a fee of $340 per hour for this estate litigation. Thus, the hourly rate of $350 per hour is a reasonable hourly rate to be applied to this litigation.

OCO I at 14-15 n.5 (emphasis added).[17] Hence, despite the orphans' court's determination that the litigation regarding the administration of this Estate "was not unduly complex," *id.* at 14 n.5, it approved Estate counsel's fees at a rate "substantially higher than any estate legal fee previously approved by the court — and consistent with a legal fee previously approved by the court in a complex civil litigation[,]" OCO III at 2.

Upon review, it is apparent that — in addition to considering the prevailing local rates — the orphans' court also considered the complexity of the issues involved and Smolen's level of professional skill in determining the reasonableness of BLG's fees. *See LaRocca*, 246 A.2d at 339 (listing the factors to be considered in determining the reasonableness of attorneys' fees, including, *inter alia*, "the difficulty of the problems involved" and "the professional skill and standing of the attorney in his profession"); *Carmen Enters., Inc.*, 185 A.3d at 390 ("The trial court does not have to address every *LaRocca* factor."); *id.* ("Consideration of **any one or a combination** of the *LaRocca* factors may convince the court … a different fee is justified.") (emphasis in original; citation omitted); *see also Twp. of Millcreek v.*

---

[17] In response to Appellants' assertion that the orphans' court's decision created a price ceiling for legal fees in Susquehanna County, the orphans' court clarified it did **not** "cap" the legal fees. *See* OCO III at 2. Rather, it merely assessed the reasonableness of the legal fees charged by BLG in this matter based upon the *LaRocca* factors as applied to the local market prices and adjusted the fees accordingly. *See id.*

*Angela Cres Trust of June 25, 1998*, 222 A.3d 1199, 1209 n.11 (Pa. Cmwlth. 2019) (determining "not every *LaRocca* factor is relevant [in this matter] and required to be considered by the court");[18] OCO I at 11 (noting Objectors did not take issue here with the amount or quality of work provided by BLG). We deem the orphans' court's findings to be supported by competent evidence in the record, and we discern no abuse of the court's discretion in its reduction of BLG's legal fees.

II. *Surcharge*

In issues 2 and 3, Appellants challenge the orphans' court's imposition of a surcharge against Grissel in the amount of $72,500 plus interest, as a result of Grissel's failure to timely file income tax returns on behalf of the Estate. Essentially, they argue the orphans' court improperly shifted the burden of proving the elements of a surcharge claim from Objectors to Grissel and nonetheless imposed a surcharge "for an admitted and fully cured breach…." Appellant's Brief at 113-14, 119; *see also id.* at 125 (asserting Grissel agreed to pay the penalties and interest assessed due to her belated filing of the Estate's income tax returns, "which fully cured any potential breach and nullified any potential loss"). Appellants have failed to convince us any relief is warranted on these claims.

---

[18] We recognize "a decision of the Commonwealth Court is not binding precedent upon this Court; however, it may be considered for its persuasive value." *Holland ex rel. Holland v. Marcy*, 817 A.2d 1082, 1083 n.1 (Pa. Super. 2002) (citation omitted).

As the orphans' court so aptly opined:

In her capacity as a fiduciary of Decedent's Estate, Grissel was "required to use such common skill, prudence[,] and caution as a prudent man, under similar circumstances, would exercise in connection with the management of his own estate." ***In re [Lohm's] Estate***…, 269 A.2d 451, 454 (Pa. 1970). "[A] surcharge may be imposed on the execut[rix] to compensate the estate for any losses incurred by the execut[rix's] lack of due care." ***In re Estate of Schultheis***, 747 A.2d 918, 927 (Pa. Super. [2000])…. The party seeking the imposition of a surcharge bears the burden of proving the fiduciary engaged in wrongdoing, and[] once evidence is presented demonstrating a lack of due care, the fiduciary then bears the burden of presenting evidence to avoid the imposition of a surcharge. ***Id.*** "Our Supreme Court has held that a standard of negligence is applied when evaluating whether an executor's management of an estate warrants a surcharge." ***In re Estate of Westin***, 874 A.2d 139, 144 (Pa. Super. 2005). Where a fiduciary through negligence has failed to pay taxes in a timely manner, it is appropriate for a surcharge to be applied against the fiduciary in the amount of the late fees and interest paid resulting from the negligent delay. ***See*** … ***Lohm's Estate***, 269 A.2d [at] 455-57 … (imposing [a] surcharge that eliminated [the] estate's counsel fees and executor commission where taxes were not paid in a timely manner); ***In re Jones' Estate***, 162 A.2d 408, 412 (Pa. 1960) (affirming imposition of [a] surcharge in [the] amount of interest and penalties incurred based upon [the executors'] negligent failure to timely pay taxes due); ***In re Padezanin***, 937 A.2d 475, 486 (Pa. Super. 2007) (finding that "a surcharge in the amount of penalties and interest occasioned by [the executrix's] dereliction of her responsibility to timely pay taxes on the IRA was proper[]"); ***In re Estate of Geniviva***, 6[75] A.2d 306, 311 (Pa. Super. 1996) (affirming [the] imposition of [a] surcharge where [the] executor failed to pay taxes until three and one-half years after taxes were due)….

OCO I at 7-8.

"The ultimate responsibility for the payment of estate taxes falls upon the executor." ***Estate of Geniviva***, 675 A.2d at 311. Here, "there was no dispute … [Grissel] failed to file timely fiduciary tax returns and … those

- 29 -

failures resulted in the Estate['s] suffering an unnecessary loss of $72,500 in interest and penalties." OCO III at 3; *see also* OCO I at 7 (noting "[t]he parties stipulated … Grissel's failure to file timely income tax returns from 2015 through 2019 resulted in Decedent's Estate['s] incurring interest and penalties in the amount of $72,500"); *id.* at 9 ("Grissel presented no evidence to demonstrate any reasonable explanation that would have excused the [belated] filing of the Estate income tax returns."); OCO III at 3 (finding the losses incurred by the Estate were a result of Grissel's negligence). Thus, the orphans' court surcharged Grissel in the amount of $72,500, plus interest at the rate of 6% from July 2020. *See* Order, 5/23/24, at ¶ 1. We discern no abuse of discretion in the orphans' court's surcharging Grissel for the interest and penalties incurred by the Estate as a direct result of her dereliction of her duties. *See Lohm's Estate*, *supra*; *Jones' Estate*, *supra*; *Estate of Geniviva*, *supra*; *see also Estate of Westin*, 874 A.2d at 147 (recognizing cases in which our appellate courts have upheld an auditing court's imposition of interest on a surcharge).

To the extent Appellants argue Grissel's agreement to pay the penalties and interest incurred due to her belated filing of the Estate's tax returns cured her breach and nullified any loss to the Estate, said claim is belied by the record. As the orphans' court explained, Grissel sought approval of a commission in the amount of $133,957, which included an arbitrary figure of $80,000 that Grissel said was intended "to compensate her for the exceptional length of service and strife specific to this Estate administration." OCO I at 8-

9. The orphans' court found Grissel "**artificially create[d]** this proposed $80,000 bonus commission fee," and then "gratuitously … offered to 'waive' this fee 'to appropriately cover the losses her failure caused.'" *Id.* at 9 (emphasis added); *see also id.* (referring to Grissel's "accounting magic"). Hence, it deemed this "a creative accounting scheme" designed by Grissel "to avoid her responsibility for the substantial harm … her negligence has caused to Decedent's Estate." *Id.* at 16. It is not the role of this Court to reweigh the evidence and substitute our judgment for that of the factfinder. *See Estate of Grigg*, 324 A.3d at 45. Thus, we defer to the findings of the orphans' court. *See Estate of Harper*, 975 A.2d at 1159.

### III. Evidentiary Issues

Next, Appellants claim the orphans' court abused its discretion by:

(a) declining to consider facts demonstrating the complex, lengthy[,] and extraordinary nature of this Estate, including Executrix's siblings' "unclean hands[";] (b) admitting and relying upon improper hearsay evidence based on the judicial admission exception (which was inapplicable); [and] (c) relying on an emotional letter Executrix wrote to her sister in 2013, taken out of context, while ignoring the facts at the relevant time and capriciously disregarding all the evidence Executrix presented….

Appellants' Brief at 5 (cleaned up); *see also* Appellants' Pa.R.A.P. 1925(b) Statement, 8/4/25, at ¶ 4 (same).

Initially, we note Pennsylvania Rule of Appellate Procedure 1925(b)(4)(ii) requires an appellant's Rule 1925(b) statement to "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge[.]" Pa.R.A.P. 1925(b)(4)(ii).

Where an issue is too vague for the trial court to identify and address the issue to be raised on appeal, that issue is deemed to be waived. **See Commonwealth v. Dowling**, 778 A.2d 683, 686 (Pa. Super. 2001); **see also** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Rule 1925(b) s]tatement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Here, the orphans' court suggests Appellants' claim that it abused its discretion by relying upon improper hearsay evidence based on the judicial admission exception is too vague to preserve the issue for appeal. **See** OCO III at 5. It opined: "Appellants have failed to identify the purported hearsay evidence … the court relied upon improperly. In the absence of such identifying information, this court is unable to specifically address the vague contention." **Id.** Especially given the voluminous record in this matter, we agree with the orphans' court that Appellants failed to adequately identify the issue to be raised on appeal and, thus, we deem this issue waived. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); **Greater Erie Indus. Dev. Corp. v. Presque Isle Downs, Inc.**, 88 A.3d 222, 225 (Pa. Super. 2014) (*en banc*) ("In determining whether an appellant has waived his issues on appeal based on non-compliance with Pa.R.A.P. 1925, it is the trial court's order that triggers an appellant's obligation[;] … therefore, we look first to the language of that order.") (cleaned up); Orphans' Court Order, 7/15/25, at 1 (warning Appellants "[a]ny

issue not properly included in the Statement timely filed and served pursuant to subdivision (b) shall be deemed waived"); *see also Dowling*, 778 A.2d at 686 ("When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review.") (citation omitted); *Commonwealth v. Foreus*, No. 161 MDA 2024, unpublished memorandum at 16-17 (Pa. Super. filed Oct. 10, 2024) (determining the Rule 1925(b) statement was too vague to preserve an issue for review where the appellant challenged whether the trial court erroneously admitted hearsay evidence, but failed to specify which testimony was purportedly inadmissible).[19]

Likewise, the orphans' court suggests Appellants' assertion that it abused its discretion by "capriciously disregarding all the evidence Executrix presented[,]" failed to adequately identify the issue to be raised on appeal. *See* OCO III at 7. The orphans' court conveyed it lacked "any ability to meaningfully address this vague assertion." *Id.*; *see also id.* at 7-8 (observing "Appellants presented a disjointed and confusing defense of their proposed accounting … and failed to present much, if any, evidence to support the proposed accounting and overcome the objections thereto"). As Appellants' vague statement of this claim has hampered appellate review, we deem this issue waived as well. *See* Pa.R.A.P. 1925(b)(4)(vii); *Dowling*, 778 A.2d at 686; *id.* at 686-87 ("A concise statement which is too vague to allow

---

[19] *See* Pa.R.A.P. 126(b) (directing that unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

the court to identify the issues raised on appeal is the functional equivalent of no concise statement at all.") (cleaned up).

Next, we address Appellants' assertion the orphans' court abused its discretion by declining to consider facts demonstrating the complex and extraordinary nature of the Estate, including Objectors' unclean hands.[20] Appellants confusingly argue:

> The orphans' court refused to consider facts demonstrating … this was a complex estate (including [Objectors'] unclean hands) because Executrix opted to file a reply to the objections, which she was not required to do. *See* Pa.O.C.R. 2.8(a). By filing her reply, and providing testimony in support thereof, Executrix was attempting to avail the orphans' court, and Object[ors'] counsel, of facts that would assist in a more comprehensive understanding of the Estate's history. Yet, because Executrix opted to file a reply to the objections, the orphans' court *sua sponte* held … Executrix failed to properly raise the affirmative defenses of unclean hands and estoppel, said she raised them for the first time in her brief, and held … she was barred from asserting these defenses as a result.
>
> Contrary to the orphan's court's factual findings, however, Executrix did expressly plead facts demonstrating … this was a

---

[20] By way of background, in Grissel's brief in opposition to Ilka's objections to the first and final accounting, Grissel argued Ilka could not assert her objections because she has unclean hands and that Ilka was estopped from challenging the accounting because she had consented to Grissel's conduct. *See* OCO I at 25 (citation to record omitted). The orphans' court found, however, Grissel failed to raise either of these affirmative defenses in her reply to Ilka's objections, as required by Pa.R.Civ.P. 1032(a), and therefore waived the defenses. *Id.*; *see also* Pa.R.Civ.P. 1032(a) (providing, subject to certain exceptions not applicable here, "[a] party waives all defenses and objections which are not presented either by preliminary objection, answer[,] or reply").

complex estate, including allegations of [Objectors'] "unclean hands." (*See* Section V.B.2, *supra*).[21]

Appellants' Brief at 126-27 (cleaned up). Appellants insist Objectors' "misconduct epitomizes the complex and extraordinary nature of this Estate and why Executrix is entitled to a much larger commission than what the [o]rphans' [c]ourt awarded…." *Id.* at 127. "In other words," they aver, "[Objectors'] unclean hands permeate the factual background of this matter and cannot be segregated therefrom — it is part of the basis for Executrix's enhanced commission." *Id.*; *see also id.* at 128 ("The alleged facts demonstrate why Executrix is entitled to her enhanced fee and how [Objectors], together with Walter, … created the problems."). They argue "Executrix could not 'waive' the [o]rphans' [c]ourt's obligation to consider Object[ors'] misconduct during this administration." *Id.* at 128.

First, it is unclear whether Appellants are contesting the waiver of the affirmative defenses of unclean hands and/or estoppel. To the extent their argument may be interpreted as a claim the orphans' court erred in finding Appellants waived these affirmative defenses, we deem such claim waived due to Appellants' failure to include the issue in their Statement of Questions Involved, as well as their failure to provide any legal analysis whatsoever in support of their argument. *See* Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly

---

[21] Section V.B.2 is a subsection of the Statement of the Case within Appellants' appellate brief, which quotes two paragraphs from Grissel's Answer to Petition to Compel Accounting — **not** Grissel's Reply to Objections — containing allegations of Objectors' unclean hands.

suggested thereby."); ***Estate of Haiko v. McGinley***, 799 A.2d 155, 161 (Pa. Super. 2002) ("Without a reasoned discussion of the law…, our ability to provide appellate review is hampered.  It is not this Court's function or duty to become an advocate for [Appellants].") (internal citations and quotation marks omitted).

To the extent Appellants contest the orphans' court's alleged failure to consider evidence demonstrating the complexity of the Estate, we are compelled to deem this claim waived due to their failure to properly develop their argument.  For instance, Appellants aver Objectors' unclean hands "**permeate** the factual background of this matter[,]" ***id.*** at 127 (emphasis added), yet — other than the two paragraphs referred to from Grissel's Answer to Petition to Compel Accounting — they fail to specify precisely what evidence they are referring to or where in the record this evidence appears.  Nor do they cite any legal authority or engage in any discussion regarding how these alleged facts demonstrate the Estate is complex.  ***See*** Pa.R.A.P. 2119(c) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears…."); Pa.R.A.P. 2119(d) ("When the finding of, or the refusal to find, a fact is argued, the argument must contain a synopsis of all the evidence on the point, with a reference to the place in the record where the evidence may be found."); ***Wallace v. State Farm Mutual Automobile Insurance Company***, 199

A.3d 1249, 1255 (Pa. Super. 2018) ("We shall not scour the record to find evidence to support an argument; instead, we will deem the issue to be waived.") (cleaned up); **Estate of Haiko**, 799 A.2d at 161 ("Without a reasoned discussion of the law…, our ability to provide appellate review is hampered.").

Notwithstanding waiver, the orphans' court conveyed it conducted "a detailed analysis of the **entire** [E]state administration" before reaching its May 23, 2024 decision. OCO III at 4 (emphasis added). It relied on expert testimony presented as to the lack of complexity of the administration of Decedent's Estate, as well as the delay in administering the Estate in a timely manner being attributed to Grissel's mismanagement. **See id.** The orphans' court opined Appellants failed to produce any testimony to substantively rebut the expert's testimony. **Id.** Regardless, the orphans' court emphasized that it "specifically recognized … the executrix encountered a number of unusual circumstances in connection with the Estate administration, and thereby increased [Grissel's] commission based upon the additional work … reflected in the record." **Id.** (cleaned up). As the factfinder, the orphans' court was free to believe all, part, or none of the evidence presented. **See Gibbs**, 981 A.2d at 282 (citation omitted). It is not our role to reweigh the evidence and substitute our judgment for that of the factfinder. **See Estate of Grigg**, 324 A.3d at 45.

Regarding Appellants' contention the orphans' court erred in relying on "an emotional letter" Grissel wrote to Ilka in 2013, we observe Appellants do

not deny Grissel's writing the letter. Instead, they aver the orphans' court considered the letter out of context and, as a result, improperly inferred Grissel had no interest in closing the Estate "**for the next 10 years**, despite the obvious consequences to [Grissel] both personally and financially." Appellants' Brief at 133 (emphasis in original); *see also id.* at 132 (asserting, "in 2013, Executrix was gifting her personal funds to [Ilka] because there were no liquid funds in the Estate to distribute at that time") (emphasis omitted). However, Appellants fail to point to any evidence in the record illustrating the orphans' court made such an inference based on Grissel's letter. *See* Pa.R.A.P. 2119(c) ("If reference is made to the … opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith … a reference to the place in the record where the matter referred to appears…."); *Wallace*, 199 A.3d at 1255 ("We shall not scour the record to find evidence to support an argument; instead, we will deem the issue to be waived.") (cleaned up).

Nevertheless, we discern the orphans' court simply found Ilka and Ingrid had been pressuring Grissel to wrap up the Estate administration in 2013, and in response to their request, Grissel wrote a letter to Ilka indicating she would not do so due to a personal dispute between the two of them. *See* OCO I at 3; OCO III at 6-7; *see also* OCO III at 7 (stating these facts are undisputed by the parties). In making this factual finding, the orphans' court explained:

> [It] ascribed the weight to the correspondence … it properly deserved, *i.e.*, it confirmed … the heirs were seeking a timely resolution of the Estate and … the executrix refused to do so for

personal reasons. There was nothing improper about making this finding[,] which was not contested. **See In re Fiedler**, 132 A.3d 1010, 1018 (Pa. Super. 2016) (noting … the orphans' court "sits as the fact-finder, it determines the credibility of witnesses[,] and, on review, the Superior Court will not reverse its credibility determinations absent an abuse of that discretion").

OCO III at 7 (cleaned up). As these findings are supported by the evidence of record, we discern no abuse of discretion on the part of the orphans' court.

## IV. Executrix Commission

We address subsections (d) and (e) of Appellants' fourth issue together, as both these claims relate to the executrix commission awarded to Grissel. In doing so, we are guided by the following principles.

> Pursuant to 20 Pa.C.S. § 3537, the orphans' court must "allow such compensation to the personal representative as shall in the circumstances be reasonable and just, and may calculate such compensation on a graduated percentage." However, "the basis for determining whether compensation is reasonable under section 3537 depends upon the value of the services actually rendered." … **Estate of Geniviva**, … 675 A.2d [at] 312-13 … (citing … **Estate of Rees**, … 625 A.2d [at 1206]). In addition, personal representatives seeking compensation from estate assets bear "the burden of establishing facts which show the reasonableness of their fees and entitlement to the compensation claims." **Id.** at 313 (quoting **Estate of Rees**, **supra** at 1206). Finally, "the determination of whether the executor's fees are reasonable is left to the sound discretion of the orphans' court, and we will not disturb its determination absent a clear error or an abuse of discretion." **Id.**

**Estate of Harper**, 975 A.2d at 1162 (cleaned up; citation omitted). "The amount of compensation so awarded is a matter peculiarly within the discretion of the orphans' court." **Id.** at 1163 (citing **Estate of Allen**, 412 A.2d 833, 840 (Pa. 1980)).

Here, Grissel sought an executrix commission totaling $133,957. **See** OCO I at 2; Appellants' Brief at 34. Appellants explain this amount includes the $53,957 anticipated commission listed in the initial 2012 Pennsylvania Inheritance Tax Return (based, in part, on the $800,000 valuation of the Brackney property), **see** Appellants' Brief at 34, plus "an additional $80,000 … in commission for the unanticipated complications [Grissel] faced during this lengthy administration, calculated as $8,000 per year for ten (10) years," **id.** at 36. Grissel thereafter agreed to waive $80,000 of her proposed commission "as a concession for her failure to properly administer Decedent's Estate to the substantial detriment of the remaining heirs." OCO I at 16. The orphans' court found this to be nothing more than "a creative accounting scheme" by Grissel "designed to avoid her responsibility for the substantial harm … her negligence … caused to Decedent's Estate." **Id.**; **see also id.** at 22 (referring to Grissel's creation of "a fictional commission" and then proposing to "waive" that fictional commission as "bookmaking trickery"). Moreover, it found Grissel failed to meet her burden to establish the requested commission was reasonable. **Id.** at 17-19. Consequently, it reduced Grissel's proposed commission to $33,850. **Id.** at 20.

In support of its decision to reduce Grissel's commission, the orphans' court opined:

> Unfortunately, Grissel has presented little to no evidence to support the work … she purportedly performed in the administration of Decedent's Estate.[8] While she seeks compensation for her more than 10 years of service in administering Decedent's Estate, Grissel fails to note … the delay

attributed to the administration rested not with anything particularly complex about the Estate itself but because of Grissel's negligence and inaction in administering the Estate.[9] The record demonstrates that for a period of **four years** (2015 through 2019), Grissel failed to take even the most rudimentary steps to file income tax returns for Decedent's Estate. In short, Grissel's attempt to augment and supplement her commission based upon her "extraordinary services" demonstrates a gross misunderstanding of her fiduciary obligations … she undertook when she accepted the position as the executrix of Decedent's Estate. The only thing "extraordinary" presented on this record is Grissel's mismanagement of Decedent's Estate for more than 12 years — and her attempt to cash out on her egregious mismanagement.

> [8] … At the objections hearing, Grissel did not provide the actual documentation to support her claimed commission.[22]

> [9] While Grissel continues to suggest … there was something complicated and difficult about the administration of Decedent's Estate, she proffers merely that the difficulty arose from Walter['s] residing in the Vestal property. While this admittedly resulted in some litigation to resolve the matter, the litigation itself involved the time and effort of counsel — not Grissel. Counsel will be compensated at a reasonable hourly rate for the work performed in resolving the Vestal property issue. The delay in the administration arose not because Walter wanted to retain the Vestal property; rather, the delay occurred because Grissel failed to take reasonable and prudent steps to resolve that issue in a timely manner, despite the written requests from Ilka and Ingrid through their counsel to do so as early as 2013. In response to these requests, Grissel simply refused to take any action because she did not have a reason to do so.

> ***

Significantly, Grissel did not seek to finalize this Estate of her own accord; rather, it required affirmative steps by Ilka to seek court intervention to get Decedent's Estate finalized. After waiting more

---

[22] **See** N.T. at 38-39 (Grissel's indicating she did not keep track of the time she spent or the tasks she performed as executrix for the Estate).

than a decade to get a final resolution of Decedent's Estate, and despite having demanded through counsel such a final resolution in 2013, Ilka had to resort to litigation to prompt Grissel to fulfill her fiduciary obligations….

During the objection hearing, credible expert testimony was presented as to the deficiencies in Grissel's performance in the administration of Decedent's Estate.[23]  Based upon the gross mismanagement of Decedent's Estate, Briechle opined … no commission should be awarded to Grissel, but, if any commission were awarded at all, it should be limited to the amount approved by the Department of Revenue through the inheritance tax return — namely, $8,376.  As noted, Grissel has presented no evidence to rebut in any substantial way the expert testimony.

Where a fiduciary has failed to present evidence to support a requested commission, the court itself must set an amount that is reasonable.  *See In re Estate of Sonovick*, 541 A.2d 374, 376-77 (Pa. Super. 1988) (noting … where an executrix fails "to present evidence regarding the reasonableness of their fees," … the court must "reasonably determine the appropriate amount of compensation to be paid").  In this case, Decedent owned 3 properties at the time of his death: (1) the Bronx property, which had a value of roughly $350,000; (2) the Vestal property, which had a net value of approximately $161,000; and (3) the Brackney property, which had a value of $166,000 as set forth on the amended Pennsylvania Inheritance Tax Return.[11]  Thus, the total value of Decedent's Estate was roughly $677,000.  Given the lack of any significant evidence as to the work performed by Grissel in administering Decedent's Estate, the court recognizes … the Superior Court has generally approved a commission of 3% connected with the work of an estate administrator.  *See … Estate*

_____

[23] *See* N.T. at 85 (Briechle's testifying Grissel "did not administer [the Estate] correctly"); *id.* at 92 (Briechle's noting the penalties and interest incurred by the Estate due to Grissel's failure to timely file tax returns); *id.* at 97-98 (Briechle's opining additional legal fees were incurred by the Estate "resulting from the [e]xecutrix's malfeasance[,]" *e.g.*, the executrix's decision to have her counsel handle Walter's eviction from the Vestal property in a New York court rather than allowing the Susquehanna County Orphans' Court to handle the entire matter); *id.* at 103 (Briechle's explaining the executrix wasted time by having the eviction handled in New York; surmising the Susquehanna County Orphans' Court "could have crafted a plan to resolve the Estate many, many years ago").

*of Harper*, 975 A.2d [at] 1163 … (collecting cases recognizing the propriety of a 3% commission for estate administration work). Thus, a reasonable fee for Grissel's estate administration work would be roughly $20,000.

> [11] In preparing her accounting, Grissel used a value of $800,000 for the Brackney property, which was the initial value set forth on the first Pennsylvania Inheritance Tax Return, which was later amended to reflect a value of roughly $166,000. Thus, the court will utilize the value that has been accepted by the Department of Revenue….

While an estate with just three parcels of real property is not overly complicated or difficult, Grissel presented evidence … she personally performed substantial work to clean and prepare the Bronx property for sale. Moreover, while the situation involving Walter['s] living in the Vestal property was not a substantially complex issue, it still presented Grissel with circumstances that are not necessarily attendant to the usual estate administration. In consideration of the additional work performed by Grissel in connection with the Bronx property and the Vestal property, the court has opted to increase Grissel's commission to 5% of the corpus, or the amount of $33,850.

OCO I at 16-20 (cleaned up; emphasis in original).

First, Appellants argue the orphans' court abused its discretion in finding Grissel's proposed commission unreasonable. Appellants' Brief at 144-45. They also take issue with the orphans' court's labeling their method of calculating the executrix's proposed commission "bookmaking trickery," asserting there are no facts to support this conclusion. *Id.* at 145, 145 n.47. Appellants insist Grissel is entitled not only to the $53,957 in commission calculated at the outset of the administration of the Estate, but also to extra commission attributable to the extraordinary circumstances of this case. *Id.* at 145; *see also id.* at 145-47 (asserting Grissel had to, *inter alia*, manage the Estate for an extraordinary period, deal with feuding siblings, go through

"the laborious process of interviewing and retaining two separate attorneys over the course of a decade," and navigate (together with her counsel) extensive litigation). Yet, Appellants claim "Executrix has been told she will be compensated for NOTHING beyond her services in the initial 1.5 years of administration…." *Id.* at 148 (emphasis in original).

To the contrary, we are satisfied the orphans' court conducted a thorough analysis of the circumstances of this case to reach a "reasonable and just" amount to compensate Grissel for her services as the executrix throughout the entirety of her administration of this Estate. *See* 20 Pa.C.S. § 3537; *Estate of Harper*, 975 A.2d at 1162 (providing "the determination of whether the executor's fees are reasonable is left to the sound discretion of the orphans' court"); *id.* at 1163 ("The amount of compensation so awarded is a matter peculiarly within the discretion of the orphans' court.") (citation omitted). On issues of credibility, we defer to the factfinder who had the opportunity to observe the witnesses firsthand; it is not our role to reweigh the evidence. *See Estate of Grigg*, 374 A.3d at 45. Moreover, we note Appellants have a heavy burden to convince us to overturn the orphan's court's exercise of its discretion. *See In re Estate of Warden*, 2 A.3d 565, 571 (Pa. Super. 2010) ("[W]e will not lightly find reversible error and will reverse an orphans' court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record.") (citation omitted). We deem the orphans' court's determination that Grissel's proposed commission was unreasonable

to be supported by competent evidence of record and discern no abuse of discretion; thus, we will not disturb its decision.

As to the orphans' court's calculation of Grissel's commission, Appellants contend the orphans' court erred in using the taxable value of the Estate's principal assets instead of the gross assets of the Estate.  Appellants' Brief at 142-43.  In support of their argument, they aver this Court previously held, "[f]or purposes of calculating the [e]xecutrix commission, … using anything other than the actual value of the gross estate for accounting purposes … is reversible legal error."  *Id.* at 143 (citing *In re Estate of Preston*, 560 A.2d 160, 164 (Pa. Super. 1989)).  According to Appellants, we reversed the orphan's court's decision in *Preston*, "because its manner of computing the executrix commission[] was 'clearly erroneous,' and commissions should have been 'computed on the basis of the estate's total assets as listed in the final accounting[,] … not on the basis of the total taxable estate as determined for inheritance tax purposes.'"  *Id.* at 142 (quoting *Preston*, 560 A.2d at 164).  No relief is due on this claim.

First, Appellants misrepresent this Court's holding in *Preston*.  Therein, we explained:

> This appeal questions the manner of the calculation of executor's commissions and attorney[s'] fees due for the administration of a decedent's estate.  Herein, for the purposes of calculating the commissions and fees due, the orphans' court included, as assets of the estate, marital assets which passed outside the estate.  The court also calculated the commissions and fees using an arbitrary percentage-formula….

- 45 -

*Preston*, 560 A.2d at 160-61. We dismissed the appeal as interlocutory. *Id.* at 161; *see also id.* at 162 (determining "[t]here was no final decree from which an appeal could be taken"). Nevertheless, in an effort to prevent the use of proscribed practices in future cases, we addressed the issue of compensation for executors and their counsel. *Id.* at 163.[24]

In doing so, we noted "jointly-held property passes outside of a decedent's estate and should not be included in an estate's assets for purposes of computing an executor's commissions…." *Id.* at 164. Thus, we advised the orphans' court's calculation of the executor's commission based on the inventory listed in the first and final accounting plus the jointly-held property was "clearly erroneous." *Id.* We explained, the "commissions paid out of the estate … should have been calculated from the total assets of the estate as reported in the first and final accounting[,] … **not** on the basis of the total taxable estate as determined for inheritance tax purposes." *Id.* (emphasis in

_____

[24] Due to the disposition of the case, at best, we consider the *Preston* Court's guidance regarding proper practices for calculating an executor's commission *judicial dictum*. *See HTR Rests., Inc. v. Erie Ins. Exch.*, 260 A.3d 978, 989 n.3 (Pa. Super. 2021) ("*Judicial dictum*" … is[] a statement a court expressly uses to guide parties in their future conduct. As a general rule, such an expression of opinion on a point involved in a case, argued by counsel and deliberately mentioned by the court, although not essential to the disposition of the case, is distinct from mere *obiter dictum*, and becomes authoritative when the court expressly declares it to be a guide for future conduct. Thus, *judicial dictum* should receive dispositive weight in a lower court.") (citing 21 C.J.S. Courts § 226); *but cf.* 21 C.J.S. Courts § 226 ("A court is not bound to follow *dicta* in a prior case that did not fully debate the point currently at issue.").

original; footnote omitted).[25]  Notably, the emphasis in **Preston** was **which assets** should be included in the calculation of the executor's commission — **not the value** of those assets.[26]

Additionally, in **Preston**, we observed the executor's commission was awarded "simply upon a percentage basis — **no inquiry** was made by the orphans' court into the reasonableness of the … commissions dispersed." **Id.** at 165 (emphasis added).  Hence, we cautioned, "[e]gregious error is committed when a court awards commissions … simply on a percentage basis without inquiry into the reasonableness of the compensation…." **Id.**  Again, we find the instant matter distinguishable.  Significantly, in the matter before us, the orphans' court conducted an extensive inquiry into the reasonableness of Grissel's compensation.  **See** OCO I at 16-20.  It did not simply calculate her commission based upon a percentage, as the orphans' court did in **Preston**.

Regardless, it is well-settled the determination of whether an executor's commission is reasonable, as well as the computation of the executor's compensation, is left to the sound discretion of the orphans' court.  **See**

---

[25] The **Preston** Court did not expressly state "using **anything other than** the actual value of the gross estate for accounting purposes" when calculating an executor's commission constitutes reversible error, as suggested by Appellants.  Appellants' Brief at 143 (emphasis added).

[26] Unlike the case *sub judice*, in **Preston**, the orphans' court had improperly included in its calculation of the commission additional, jointly-held property which passed outside of the estate.  Here, there was no dispute over which properties the orphans' court included in its computation of Grissel's commission.

*Estate of Harper*, 975 A.2d at 1162-63 (citations omitted). "While as a matter of convenience, the compensation of a fiduciary may be arrived at by way of percentage," *In re Williamson's Estate*, 82 A.2d 49, 52 (Pa. 1951), the general rule evolving from caselaw accepting 3% of the corpus of an estate as a *prima facie* fair and reasonable executor's commission is merely a "rule of thumb[,]" *In re Reed's Estate*, 341 A.2d 108, 110 (Pa. 1975); *see also Williamson's Estate*, 82 A.2d at 53 (stressing "percentage is used only as a matter of convenience as an initial guide"). The true test for the reasonableness of an executor's commission is "what the services actually were worth." *Reed's Estate*, 341 A.2d at 110. Where there is evidence demonstrating the services are actually worth more or less than what is *prima facie* reasonable, *i.e.*, where the executor performed extraordinary duties or where the performance falls below accepted norms, the orphans' court may increase or decrease the amount of compensation accordingly. *See id.* at 110-11.

Instantly, the orphans' court began with 3% of the corpus of the Estate in determining a fair and reasonable commission for Grissel. While we acknowledge Pennsylvania courts typically apply the assessed value of an estate's assets as listed in the formal accounting when stating the value of the corpus for the purposes of calculating an executor's commission,[27] we do not

---

[27] *See, e.g.*, *Reed's Estate*, 341 A.2d at 110 (stating "a rule [has] evolved that allowance for executor's fees of 3% of the appraised value of the corpus
*(Footnote Continued Next Page)*

consider the orphans' court's use here of the net and/or taxable values of the Estate assets to be reversible error because it merely used the 3% as a starting point. After arriving at $20,000 as a *prima facie* reasonable commission for Grissel, the orphans' court gave ample consideration to the value and quality of Grissel's performance as the executrix. Despite its finding Grissel's "egregious mismanagement" of the Estate caused unnecessary delay in the Estate's administration, the orphans' court opted to increase Grissel's commission to $33,850, in light of some unusual circumstances arising in the administration of this Estate and the substantial work Grissel performed in connection with the Bronx and Vestal properties. We conclude the orphans' court was well-within its discretion in deciding to award this amount. **See Estate of Harper**, **supra**; **Reed's Estate**, **supra**. Thus, we will not disturb the court's award of $33,850 in commission to Grissel.

V.    *Attorneys' Fees*

In their last two issues, Appellants contest the orphans' court's handling of certain attorneys' fees incurred throughout this litigation. First, regarding attorneys' fees incurred by the Estate, Appellants claim the orphans' court erred in directing the Estate's counsel to remove from its formal accounting any charges related to the litigation surrounding the reasonableness of BLG's legal fees, arguing there is no legal basis to support this ruling. Appellants'

---

at the time of transfer to the fiduciary for administration is *prima facie* fair and reasonable"); **Estate of Harper**, 975 A.2d at 1163 (reducing the executor's commission to approximately 3% of the "inventory value" of the estate ).

Brief at 148-49; ***see also id.*** at 149 n.49 (noting the orphans' court cited a single, out-of-state case in support of its decision, which it argues is inapplicable here); OCO I at 15 n.7. Similarly, Appellants claim the orphans' court erroneously surcharged Grissel for the attorneys' fees incurred in the defense of any sustained objections. Appellants' Brief at 149-50 (citing Order, 5/23/24, at ¶ 8). They argue there is no legal support for this surcharge award "where the legal fees were a reasonable and necessary expense incurred by the [e]xecutrix to conclude the administration of the Estate." ***Id.*** at 150. No relief is warranted on these claims.

Indeed, the orphans' court instructed Estate's counsel not to include any fees related to the unsuccessful defense of BLG's attorneys' fees in the amended first and final accounting. ***See*** OCO I at 15 n.7 (suggesting "an attorney is not entitled to a fee connected with defending objections to the attorney's fee") (citation omitted). In its Rule 1925(a) opinion, the orphans' court explained:

> [T]he court has the obligation to review any fees charged by an attorney to ensure … such fees are reasonable. If an attorney charges a fee consistent with the geographic market of the court itself, then the review hearing, if even necessary, is relatively short and without difficulty. Where an attorney seeks to utilize a fee rate consistent with a large metropolitan market in a small rural community, … the burden rests upon the attorney to prove the reasonableness of such a fee. Where the fee is determined to be unreasonable, and the court must reduce the fee, it would be inequitable to require the heirs of the estate to bear the costs of the failed defense of an unreasonable attorney fee.

OCO III at 8-9. We agree. *See In re Istocin's Estate*, 190 A. 383, 386 (Pa. Super. 1937) ("The orphans' court administers equity, and, as in an equity proceeding, the disposition of the costs is a matter largely within the discretion of that court….").

In further support, the orphans' court cited *Matter of Estate of Larson*, 694 P.2d 1051 (Wash. 1985), which held "an attorney in probate is not entitled to additional fees for attorneys and experts in proving the reasonableness of his fee in the final report." OCO I at 15 n.7 (quoting *Estate of Larson*, 694 P.2d at 1060).[28] Therein, the court reasoned "[t]he attorneys' defense to the objections served only their own interests and in no way worked to the benefit of the estate." *Estate of Larson*, 694 P.2d at 1060. Pennsylvania courts have similarly determined attorneys' fees for services that do not benefit the estate should not be charged to the estate. *See, e.g.*, *Estate of Bruner*, 691 A.2d 530, 534 (Pa. Super. 1997) (concluding attorneys' fees for services rendered to the executor in his failed attempt to secure the residue of the estate for himself, which did not benefit the estate, were improperly charged to the estate). Thus, we believe the orphans' court properly exercised its discretion in disallowing the attorneys' fees incurred in connection with the defense of the reasonableness of BLG's fees.

_____

[28] We recognize we are not bound by the decision in *Estate of Larson*; however, we may cite out-of-state cases for guidance to the degree we find them useful and not incompatible with Pennsylvania law. *See Trach v. Fellin*, 817 A.2d 1102, 1115 (Pa. Super. 2003); *see also id.* (observing, "[w]e receive out-of-state decisions as persuasive authority but not binding precedent") (cleaned up).

Likewise, the orphans' court granted Objectors' request for a surcharge against Grissel for attorneys' fees incurred by the Estate in opposing their successful objections, ordering: "Grissel … shall be responsible for any attorney[s'] fees incurred in connection with the defense of any objections sustained as well as responsible for any attorney[s'] fees incurred in connection with any unsuccessful attempt to avoid an imposed surcharge." Order, 5/23/24, at ¶ 8. Appellants fail to cite any legal authority or to engage in any legal analysis whatsoever in support of their claim the orphans' court erred in awarding this surcharge. Thus, we are constrained to deem this issue waived. *See In re S.T.S., Jr.*, 76 A.3d 24, 42 (Pa. Super. 2013) ("When an appellant fails to develop his issue in an argument and fails to cite any legal authority, the issue is waived."). Even if Appellants had properly preserved this claim, we would have deemed their argument to be meritless. "While the costs of an audit are deductible from the estate, an administrator may be charged with the costs of an audit made necessary by his fault." *In re Estate of Vaughn*, 461 A.2d 1318, 1321 (Pa. Super. 1983). Here, the orphans' court determined the surcharge was appropriate because the Estate suffered substantial losses due to her negligence and gross mismanagement of the Estate. *See* OCO I at 22. Thus, we would discern no abuse of discretion in the orphans' court's granting the surcharge against Grissel for attorneys' fees incurred by the Estate in opposing Objector's successful objections.

Lastly, Appellants claim the orphans' court erred in finding the Estate liable for any attorneys' fees or expert fees incurred by Objectors in connection

with their successful pursuit of surcharges and objections.  Appellants' Brief at 150; *see also* Order, 5/23/24, at ¶ 9 (granting Objectors' request to be reimbursed attorneys' fees and expert costs incurred in litigating their successful objections and request for surcharges).  They contend, "Legal fees may be paid by an estate only where an object[or]'s counsel has benefited and caused valuable assets not previously included to be added to the estate, such as in the surcharge context."  Appellants' Brief at 150-51 (citing **Padezanin**, 937 A.2d at 484).  Appellants argue, however, charging Objectors' fees to the Estate is not appropriate here, because Objectors' counsel has not caused any valuable assets to be added to the Estate.  *Id.* at 151.  We deem this claim to be wholly without merit.

Instantly, the orphans' court opined:

The heirs were seeking a resolution of the Estate administration since 2013 without any success.  … Objector[s] had to initiate litigation to obtain a final resolution of the Estate administration only after waiting for **eleven years** for a final resolution.  While the initiation of litigation might be something that one would expect to bring a swift conclusion to the Estate administration, the end result was the opposite — a highly contested litigation involving primarily two questions: (1) the appropriate compensation for the executrix; and (2) the appropriate compensation for Estate counsel.  The efforts of … Objector[s] resulted in the Estate['s] recovering over $70,000 that had been lost due to the executrix's mismanagement and negligence, as well as a reduction in the attorneys' fees to a rate that was reasonable for this geographic area.  Thus, Objector[s'] counsel was able to create a corpus of monies being returned to the Estate that was more than adequately [*sic*] to reasonably compensate Objector[s'] counsel, as well as continuing to allow for the Estate to have more funds than it would have had but for the objections.  Thus, Objector[s] w[ere] the primary impetus for the final resolution of the administration of this Estate and … Objector[s']

successfully recouping substantial sums for the Estate through [their] objections. Given these circumstances, it was equitable and proper to require the Estate to pay Objector[s'] attorneys' fees and costs incurred in obtaining a final administration of the Estate and in recovering monies that should not have been paid out of the Estate's coffers.

OCO III at 9-10 (cleaned up; emphasis in original). We agree. *See Estate of Vaughn*, 461 A.2d at 1320 (concluding the orphans' court abused its discretion in denying compensation for the appellant's counsel fees from the estate funds where there was "no doubt the estate was substantially benefited by the efforts of [the] appellant's counsel"); *id.* ("The effect of the orphans' court's denial of compensation for [the] appellant's attorney's fees out of estate funds is to permit the other heirs, who have never filed exceptions, to reap the benefits of the efforts of [the] appellant's counsel without having to share in the expense of producing those benefits. This would be a manifestly unreasonable and inequitable result."); *see also Istocin's Estate*, 190 A. at 386 (stating "the disposition of the costs is a matter largely within the discretion of that court").

Accordingly, we affirm the orphans' court's June 23, 2025 order confirming the first and final accounting of the Estate.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/23/2026